ROSS LEARNING, INC., a Michigan Corporation, and Ross Business Institute—Taylor, and Ross Technical Institute—Brighton, Plaintiffs,

v.

Richard W. RILEY, Secretary of Education, in his official capacity, Defendant.

Civil No. 96–40360.

United States District Court, E.D. Michigan, Southern Division.

March 31, 1997.

---

Andrew Kochanowski, Sommers, Schwartz, Southfield, MI, for Ross Business Inst.–Taylor.

Daniel R. Hurley, Asst. U.S. Atty., Detroit MI, for Richard W. Riley.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Plaintiffs, Ross Learning, Inc., Ross Business Institute—Taylor, and Ross Technical Institute—Brighton ("collectively Ross Schools" or "Ross") filed a motion for partial summary judgment on November 13, 1996 as to Counts I, II, and III of its complaint for declaratory and injunctive relief. Defendant, Richard Riley, Secretary of Education ("Secretary" or "ED"), filed his cross-motion for partial summary judgment as to the same counts on January 10, 1997.

This court heard oral argument on March 12, 1997. For the reasons set forth below, this court will deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment.[1]

## BACKGROUND

Ross Schools offer various technical training to their students. Under Federal Family Education Loan ("FFEL") programs, the students can receive loans from private lenders. Repayment of these loans is guaranteed by a state-run or non-profit guaranty agency. The U.S. Department of Education ("ED") reinsures the loans and pays off defaulted loans if the lender and guarantor have met certain requirements. In order to determine whether schools like Ross are eligible to participate in the FFEL programs, the ED periodically calculates a cohort default rate ("CDR"). A CDR is a percentage derived by taking the number of students of an institution whose FFEL loans go into default in a given federal fiscal year ("FY"), i.e., from October 1 to September 30, and dividing that number by the total number of students of an institution whose FFEL loans enter repayment in that fiscal year. The Higher Education Act of 1965, as amended ("HEA") prohibits an institution from participating in the FFEL programs if its CDR "is equal to or greater than the threshold percentage [25%] for each of the three most recent fiscal years for which data are available." 20 U.S.C. § 1085(a)(2)[2]

An institution may challenge its CDR for a given fiscal year if the ED relied upon "erroneous data" in calculating the CDR. See 20 U.S.C. § 1085(m)(1)(A) (Supp.1996). Ross was notified in February of 1996 that its CDRs for FY 1991, 1992, and 1993 were in excess of the required percentage rate of 25%.[3] See 20 U.S.C. § 1085(a)(2)(B).

---

1. This Ross–Taylor and Ross–Brighton case is a companion case to *Ross Learning Inc. et al. v. Riley*, 96–40434 in which this court today granted defendant's motion for summary judgment as to Counts IV, V, and VI which are identical to Counts IV, V and VI in the instant case. Accordingly, this court will grant final judgment to defendant, Richard Riley, Secretary of Education, in this matter.

2. 20 U.S.C. § 1085(a)(2) provides, in relevant part, that:

   (A) An institution whose cohort default rate is equal to or greater than the threshold percent-

age specified in subparagraph (B) *for each of the three most recent fiscal years for which data are available* shall not be eligible to participate in the Program. . . .
   (B) For purposes of determinations under subparagraph (A), the threshold percentage is * * * (iii) 25 percent for any succeeding fiscal year. (emphasis added) (Supp.1996).

3. The final CDR calculations determined by the ED were:

| Ross–Taylor | | Ross–Brighton | |
|---|---|---|---|
| FY 1991 | 28% | FY 1991 | 42% |
| FY 1992 | 36.6% | FY 1992 | 51.6% |
| FY 1993 | 28% | FY 1993 | 29.1% |

Thereafter, it filed erroneous data appeals based on those CDRs.

Because of an HEA provision enacted in 1993, however, Ross, whose appeals of the FY 1991–1993 CDR determinations were pending, was still allowed to participate in the FFEL program until ED made a final determination of those appeals. *See* 20 U.S.C. § 1085(a)(2)(A) and 34 C.F.R. § 668.17(c), (d).

In March of 1996, the guaranty agencies, as required, submitted preliminary data used by ED to calculate draft or "prepublication" CDR figures for FY 1994. "Pre-publication" CDRs are issued to the participating schools before becoming "official" CDRs at which time they are made available to the public. This process is designed to give the participating schools an opportunity to review and correct errors in the information used by ED to determine CDRs and is required by 20 U.S.C. § 1085(m)(1)(A) [4].

In May of 1996, ED issued its "pre-publication" FY 1994 CDRs for the Ross schools which were 17.8% and 17.7% for Taylor and Brighton respectively. In July of 1996, ED issued revised pre-publication CDRs of 19.5% and 18.5% for the Taylor and Brighton schools respectively. Since both sets of pre-publication CDRs were below the 25% threshold, Ross did not seek to challenge them.

On September 10 and 11, 1996, Ross received ED's denials of their erroneous data appeals filed in February of 1996. The ED informed Ross that since all appeals had been denied, it was no longer eligible to participate in the FFEL program until October 1997.

ED's policy with regard to the appeals process is that if the "official" FY 1994 CDR

for a school had been calculated prior to the Secretary's decision of the CDR appeals for FY 1991, 1992, and 1993, it would consider the "official" CDR for FY 1994 to be one of the "three most recent fiscal years for which data is available" in accordance with 20 U.S.C. § 1085(a)(2). *See* note 2 *supra.* If the "official" CDR is less that 25%, the ED would consider the school eligible to continue to participate in the FFEL program. If, however, ED only calculated a "prepublication" FY 1994 CDR for a school before the Secretary issued decisions on all three CDR appeals, it would not consider the "prepublication" CDR in determining whether the school's CDRs exceed the threshold "for the three most recent fiscal years for which data are available." This is the policy even if the school has not challenged any of the data used to calculate the FY 1994 prepublication CDR.

Since Ross received an adverse decision on its CDR appeals for FY 1991–1993 *after* it received a "prepublication" FY 1994 of less than 25% but before publication of the "official" CDR [5], its participation in the FFEL programs was terminated by the Secretary.[6] ED's untimely decisions in the Ross School appeals regarding the FY 1991–1993 CDR determinations coupled with its decision not to include the FY 1994 "prepublication" CDR, which was less than the permissible statutory threshold of 25%, as one of the "three most recent fiscal years for which data are available," has resulted in this litigation.

Ross essentially argues that since the unchallenged "pre-publication" CDR for FY 1994 was "available" to ED, it should have been considered as an "official" CDR and therefore Ross should have remained eligible for the FFEL program. Accordingly, Ross

---

4. 20 U.S.C. § 1085(m)(1)(A) (1996) states, in relevant part, that:

> The secretary *shall* require that each guaranty agency that has insured loans for current or former students of the institution afford such institution a reasonable opportunity (as specified by the Secretary) to review and correct errors in the information required to be provided to the Secretary by the guaranty agency for the purposes of calculating a cohort default rate for such institution, *prior* to the calculation of such rate. (emphasis added)

5. The "official" CDR data was released to all schools and the public on January 6, 1997.

6. If Ross' appeals of FY 1991, 1992 and 1993 had been decided *after* the publication of the ED's "official" 1994 CDR determination, the ED's policy would have allowed the FY 1994 CDR as one of the "three previous fiscal years data" and Ross would have retained its FFEL eligibility.

claims that the ED's policy of calculating CDRs is contrary to the Secretary's statutory authority, violates the Equal Protection Clause and is *ultra vires*. Ross Schools seek a declaratory judgment and injunction finding the Secretary's actions illegal and reinstating Ross Schools' eligibility to participate in the FFEL program. The following issues are raised in these cross-motions for summary judgment:

1. Whether the Secretary's policy of not considering the 1994 "pre-publication" CDR data as the most recent data "available" violated 20 U.S.C. § 1085 of the HEA;

2. Whether the Secretary's policy of CDR determination and application violated the Equal Protection Clause of the United States Constitution.

3. Whether the Secretary's policy of determining FFEL eligibility violated 20 U.S.C. § 1232(c) of the HEA which requires the Education Department to apply its regulations uniformly throughout the country.

### SCOPE OF REVIEW

■ This court's review of the Secretary's decision is controlled by the Administrative Procedures Act ("APA") 5 U.S.C. § 706. The APA provides the framework for reviewing the Secretary's determination and application of the HEA statutory guidelines. Under the APA, this court's review of the ED's CDR policy and its application is limited to either an "arbitrary and capricious" or an "abuse of discretion" standard.[7][8]

■ Next, this court must decide what type of deference to give the Secretary's

interpretation of the HEA. *See Chevron USA v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Supreme Court noted two questions a reviewing court must ask when confronting an agency's construction of a statute it administers. The first is whether Congress has directly spoken to the precise question at issue. If so, the court and the agency must give effect to the expressed intent of Congress. *Id.* at 842–843, 104 S.Ct. at 2781–2782. If, however, the statute is silent or ambiguous with respect to a specific issue, the second question for the court to ask is whether the agency's answer is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2781–2782. The reviewing court is not to substitute its own interpretation of the statute for that of the administrative agency and is to accord "considerable weight" to the construction of the statute by the agency charged with its administration. *Id.* at 844–845, 104 S.Ct. at 2782–2783.

The Secretary urges that as a matter of law a CDR cannot be given legal effect for purposes of determining a school's FFEL eligibility before the raw data of the CDR rates have been through the review process mandated by Congress. This construction, he argues, is clear from the language of 20 U.S.C. § 1085(m)(1)(A) and is therefore controlled by first level *Chevron* deference. The Secretary argues that the statutory language evinces clear Congressional intent that he *shall* undertake a review process *prior* to calculating a CDR. *See* U.S.C. § 1085(m)(1)(A), note 4 *supra*.

---

7. The Administrative Procedure Act 5 U.S.C. § 706(2)(A–C) states in relevant part:

   To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—...
   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
   (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(b) contrary to constitutional right, power, privilege, or immunity;
(c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights.

8. Ross' attempt to seek relief under the Declaratory Judgments Act, ("DJA") 28 U.S.C. § 2201, is without merit. The DJA is procedural in nature and does not create additional basis for federal court jurisdiction. Accordingly, the DJA cannot alter or bypass the administrative review process or judicial review thereof. *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 246, 73 S.Ct. 236, 241–42, 97 L.Ed. 291 (1952).

The Secretary also argues that he is not required by the statute to give schools the right to determine when the review process and calculation of the CDR results are completed. Instead the Secretary argues he has the discretion to determine when data is "available". The Secretary urges second level *Chevron* deference to this issue which, he claims, requires a finding that his interpretation of the CDR procedure and framework is neither "arbitrary or capricious" nor an "abuse of discretion".

Ross argues *Chevron* deference does not apply because the question of when "data are available" is one of fact. Given the plain language of 20 U.S.C. § 1085(a)(2), Ross argues, the Secretary has impermissibly conferred upon himself the power to decide when "data are available" for purposes of the CDR calculation period.[9]

#### a. When is data available under 20 U.S.C. § 1085(a)(2)

Ross urges the court to adopt a plain reading of the statutory language found in 20 U.S.C. § 1085(a)(2) where eligibility determinations must be based on "the three most recent fiscal years for which data are available." According to Ross, the sub 25% FY

1994 CDR data was "available" prior to the Secretary's rejection of Ross' appeal regarding the FY 1991, 1992, 1993 CDRs issued September 10–11, 1996. Since the CDR was "available," Ross argues it should have been included as one of the three most recent years by the Secretary.

Ross claims the CDR data was available as early as March of 1996 when the raw data was given to the schools by the guaranty agencies. Furthermore, so Ross urges, the fact that Ross chose not to challenge the CDR data that was recalculated in early July establishes that the review process required by the statute had ended by August 2, 1996– a full five weeks prior to the Secretary's denial of the Ross appeals for FY 1991–1993 CDR data.

Essentially, Ross argues that once the data for the CDR has been made available to the schools for review and they elect not to challenge it, it is "available," and that the Secretary's requirement of labeling the CDR "official" before giving it effect has no basis in the statute, and in fact, has been applied arbitrarily and capriciously amongst institutions in the FFEL program awaiting CDR determination.[10]

---

**9.** Alternatively, the plaintiffs contend that *Chevron* deference does not apply because Congress intended the data review and correction process to help institutions, such as Ross, avoid being unfairly "tarred and feathered" in the public's eye as a high default rate school. Essentially, plaintiffs argue that Congress' legislative goal was intended to protect the interests of an identified class of schools, such as Ross, by creating the review and correction process. The plaintiffs then contend that courts have refused to interpret legislation that is aimed to protect a certain class counter to the goals intended by Congress. *See NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). Plaintiffs conclude that since the legislative intent was to protect institutions such as Ross, the court should not give deference to the Secretary's interpretation of the statute because to do so would run counter to Congress' intent and harm the class Congress desired to protect.

This argument, however, lacks merit. The Plaintiff has failed to provide any evidence by way of legislative history that the statute in question was created to protect schools, such as Ross, as a class.

The Secretary, points out that the statutory language "when data are available" 20 U.S.C. § 1085(a)(1)(A), cited by plaintiffs in their brief,

was part of the Student Loan Default Prevention Initiative Act, Pub.L.No. 101–508, 104 Stat. 1388. This Act was aimed at default prevention and created criteria to weed out those schools that were not ensuring that their students would pay for the tuition loans guaranteed by the government. The title of the legislation, the Secretary contends, is a strong indication of its purpose, that being to prevent student loan defaults, thereby protecting the class which ultimately pays for such defaults-the tax payers.

The Plaintiffs respond that the phrase "when data are available" is actually found in 20 *U.S.C.* § 1085(m)(1)(A), which was enacted three years later as part of the Higher Education Technical Amendments of 1993, Pub.L.No. 103–208, 197 Stat 2468. The plaintiffs' retort, however, is to no avail. The issue is whether there is any legislative history that supports the contention that schools such as Ross were to be protected as a class by Congressional legislation. The Plaintiffs have not offered any substantive support for their formless argument of "class protection."

**10.** This issue is more thoroughly examined under section "c" *infra*.

At the outset, this court finds that the term "available," as used in § 1085(m)(1)(A) is ambiguous. Plaintiffs, in effect, concede as much when they indirectly cite "The Language of the Law" (1963) by Mellinkoff, who characterizes the term "available" as one of several "law words and phrases which are often used because they are flexible or despite their flexibility." *See Trane Co. v. Klutznick*, 87 F.R.D. 473, 476 (W.D.Wis. 1980).

■ The Secretary points to a number of faults in Ross' argument. The first is that if one takes a literal view of the statute, one could conclude that the FY 1994 CDR data becomes available at midnight of the first day of the new federal fiscal year—i.e. October 1, 1995. As such, using plaintiffs' reasoning, the Secretary argues, there is no principled reason for choosing the March date.

The Secretary's second point is that its policy of recognizing CDR data once it has been declared "official" is required by 20 U.S.C. § 1085(m)(1)(A). This section of the statute mandates that schools be given an opportunity to review and correct CDR data "[f]or the purposes of calculating a cohort default rate for such institution *prior to the calculation of such rate.*" (emphasis added) See footnote 4 *supra.*

This issue and argument was before the District Court of Northern Illinois in *Computer Learning Centers, Inc. v. Riley*, 962 F.Supp. 108 (N.D.Ill.1997) ("*CLC*"), wherein that court stated:

> "It is the prerogative of the Department to determine when information is sufficiently reliable to be considered 'available data.' The Department has decided that the information received from guaranty agencies may only be relied upon after it has gone through the entire review process, including a second rate calculation."

*Id.* at 110–11. The *CLC* court also found that the ED's determination, that CDR data is not "official" until ED makes its final CDR determination, violated neither the express language of the statute nor an impermissible reading under *Chevron.*

Even more telling is the fact that if the Secretary adopted Ross' view that the draft CDR data becomes available (i.e."official") once the school chooses not to challenge the draft data, the school would, in fact, be violating the statute. The *CLC* court noted that "[t]o give the draft rate legal effect as an official rate would violate the statutory direction that the initial review of agency data take place before the calculation of the official rate." *See CLC* at 111, n.2.

Ross has failed to provide a valid argument as to why this court should adopt its reading of the statute.[11] In light of *Chevron* deference, the Secretary's reading of the statute cannot be said to be an impermissible reading or in contradiction of the plain language.

### b. The Equal Protection Clause.

Ross alleges in its complaint that the ED's CDR calculation policy and the CDR appeals process for previous fiscal years have been applied differently to similarly situated schools and such distinctions are arbitrary, illegal, *ultra vires* and violate equal protection.

Ross does not advance a strong argument as to how or why the Equal Protection Clause was violated by the Secretary's CDR calculation policy and appeals process. Ross attempts to make the argument that it was similarly situated with a school that allegedly received favorable treatment by the Secretary in the calculation of CDR rates. Specifically, Ross cites a settlement between the Secretary and Al–Med Academy of Business and Health Care Professionals ("Al–Med"). *Al–Med Academy of Business and Health Care Professionals v. Riley*, Civ. Action No. 4:96CV00394 CAS (E.D.Mo.). Ross maintains that in the final settlement the Secretary relied upon a non-official CDR as the most recent CDR for purposes of assessing Al–Med's FFEL eligibility.

---

11. Ross also argues that since CDRs have been changed after official publication, they are never actually final. The, not so thinly veiled, implication of that argument is that the Secretary's interpretation of the statute is therefore arbitrary and capricious. The Ross argument, however, proves too much. If a CDR can never truly be final, then the Secretary's reasonable interpretation of "available" cannot be said to be anymore arbitrary than Ross' interpretation.

The Secretary responds that the settlement was not a violation of equal protection. The Secretary decided to rescind the "official" FY 1993 CDR calculations for all schools which would have the effect of leaving Al–Med without its sub twenty-five per cent CDR and therefore ineligible for the FFEL program funding. The Secretary's settlement with Al–Med simply exempted the school from the nation wide recision of the 1993 CDR results and determined that Al–Med's CDR calculation would not be part of the revisions he made. The Secretary effectively restored Al–Med's previously published "official" CDR. Notably, the Secretary did not allow Al–Med to opt out of the statutory review process nor did he utilize data that had not gone through the review process to be used to calculate an "official" CDR. Therefore, the Secretary did not give legal effect to a CDR without providing for the statutory review process.

■ The problem with Ross' equal protection claim is that Ross did not make a showing that the Secretary created classifications of schools and then impermissibly discriminated on that basis. The fact that the Secretary offered favorable settlement terms to another school does not by itself create an equal protection violation. Carving out exceptions to generally applied policies is not enough to raise an equal protection claim. *See Hameetman v. Chicago*, 776 F.2d 636. The Equal Protection Clause does not promise equal results to all. Instead, it provides that the government cannot discriminate against a person on an impermissible basis. In this case, Ross has simply not argued, nor provided any evidence from which this court could recognize such an argument, that the Secretary has violated the Equal Protection Clause through his CDR calculation policy and determination process.

**c. 20 U.S.C. § 1232(c).**

Ross' final argument is that the Secretary has violated 20 U.S.C. § 1232(c) (1996) of the

HEA. This section of the statute requires that the Secretary apply all regulations uniformly throughout the 50 states.[12] The gist of Ross' argument is that the Secretary has not applied its own regulations uniformly and has been arbitrary and capricious in its application of the CDR policy.

Ross points to three specific cases as evidence of the Secretary's lack of uniform application of the regulations. Those cases are Al–Med, New Castle School of Trade/Thompson Institute and Phillips College, Inc.

In Al–Med, as previously noted, the Secretary attached an "official" label on the 1993 CDR calculation that had been rescinded for the rest of the schools in the loan program. According to Ross, this act is proof of the Secretary's arbitrariness and capriciousness in application of its guidelines.

In Phillips College, Inc. ("PCI"), the Secretary agreed to treat the prepublication FY 1994 CDRs for 18 of the PCI schools as the "official" FY 1994 CDRs. In that case, the Secretary allegedly knew that 13 of the schools had CDR rates from the previous three years that were over the allowable CDR percentage. This action was taken in order to facilitate the sale of a number of the schools by PCI. Again, Ross posits that this is evidence of unequal treatment and differing application of the Secretary's guidelines.

Finally, in New Castle School of Trades ("NCS") and Thompson Institute ("TI"), the Secretary allegedly knew that both schools had CDR levels from the previous three years that would make the schools ineligible for FFEL funding. Yet, the Secretary allegedly agreed not to decide either school's appeal of the three previous years until after the FY 1994 CDR became "official."

Ross argues that these examples are strong evidence that the Secretary manipulates the CDR calculation and appeal process

---

**12.** 20 U.S.C. § 1232 (1996) reads in part

(a) For purposes of this section the term "regulation" means any *generally applicable* rule, regulation, guideline, interpretation, or other requirement that—

    (1) is prescribed by the Secretary or the Department; and

(2) has legally binding effect in connection with, or affecting the provision of financial assistance under any applicable rule.

(c) All regulations shall be uniformly applied and enforced throughout the 50 states. (emphasis added)

to suit his own ends. According to Ross, these cases support its argument that the regulations relied upon and applied by the Secretary are not uniformly applied.

■ The Secretary counters with two arguments. First, he argues that Ross' characterization of the cases is not accurate and that all of the cases are distinguishable from the facts in Ross. In Al–Med, for instance, the Secretary had entered into settlement negotiations during the course of litigation. The Secretary argues that the Al–Med settlement was not an arbitrary or capricious application of CDR policy. To the contrary, the Secretary's actions arose from litigation and did not give legal effect to Al–Med's CDR without providing for the statutory review process required of all institutions.

In the New Castle and Thompson litigation, the Secretary, for unrelated administrative reasons, was unable to physically obtain all of the records required to complete the appeals process. The Secretary knew the date for publication of the official FY 1994 CDR would arrive prior to decisions on the appeals. The Secretary conceded for purposes of the litigation to allow the schools to remain eligible for the FFEL program until the FY 1994 results became official. The Secretary did not agree to allow the schools to treat the draft 1994 CDRs as official nor did he agree to allow the school to decide if the CDR could be used against it. In fact, the New Castle School's 1994 CDR was over the 25% rate and the Secretary has notified the school of its loss of eligibility.

In the Phillips Colleges case, the Secretary's actions were predicated upon a set of unique facts. PCI operated over 30 schools nation wide. The ED assessed PCI fines of over $100 million for violation of the ED's sales practices regulations. PCI initiated suit seeking injunctive relief and also threatened bankruptcy. ED saw bankruptcy as a very real threat and believed there would be serious consequences to PCI students and possibly millions of dollars of unpaid liability if PCI went bankrupt.

In order to provide an orderly transfer of PCI's assets to new ownership and prevent the closing of all of the schools, the Secretary reached a settlement with PCI owners. The settlement resulted in PCI paying ED over $15 million in fines, the transfer of some of PCI's better schools to new owners (pre-approved by the ED and PCI creditors), the orderly closure of 20 PCI schools, resolution of all pending PCI administrative appeals, and a three year ban on PCI participation in the Title IV programs such as FFEL.

Due to time constraints and the need to provide potential buyers with accurate information about the future eligibility for federal aid, the Secretary made an exception to his CDR prepublication policy. The Secretary allowed the PCI FY 1994 prepublication CDR data to be considered official before the mandatory review process had been completed.

The Secretary notes that the situation in PCI is not comparable to that of the Ross schools. Ross is not in danger of going out of business, has not been fined, has not attempted to sell its schools, and has not agreed to a three year ban of participation in programs such as FFEL. All of the examples provided by Ross are factually different, involve settlement negotiations, and do not support the argument that the Secretary has violated 20 U.S.C. § 1232(c).

The Secretary's second argument is that Ross misconstrues the language of § 1232. The statute requires that all "regulations" be "uniformly applied and enforced throughout the 50 states." To be a "regulation," the settlement agreements in PCI, Al–Med, and New Castle must be a "generally applicable rule, regulation, guideline, interpretation or other requirement ..." The settlement agreements, however, were clearly *not* a "rule, regulation, guideline, interpretation or other requirement" and were certainly not "generally applicable" to other parties.

The district court in *CLC* addressed a similar argument and stated:

> The settlement of a disputed claim is not evidence of the claim's validity, nor are three settlements out of several thousand cases evidence of uneven application of the statute. The Department has introduced evidence distinguishing those settlements form the case at hand, and showing that they were made in good faith for legiti-

mate reasons ... [t]he Department must have the flexibility to settle particular cases in furtherance of the overall purpose of the statute without having to worry that a court will transform the settlement into a "policy."

Accordingly, this court finds that the Secretary has not violated 20 U.S.C. § 1232(a)-(c).

In sum, for the reasons stated, this court will deny the plaintiff's motion for summary judgment and grant defendant's cross-motion for summary judgment.

## ORDER

**IT IS HEREBY ORDERED** that plaintiffs', ROSS LEARNING, INC., ROSS BUSINESS INSTITUTE—TAYLOR, AND ROSS TECHNICAL INSTITUTE—BRIGHTON, motion for summary judgment as to Counts I, II, and III of their complaint is **DENIED** and defendant, RICHARD RILEY, SECRETARY OF EDUCATION's cross-motion for summary judgment as to Counts I, II, and III is **GRANTED**.

**SO ORDERED.**