COMPUTER LEARNING CENTERS,
INC. and Computer Learning
Center—Chicago, Plaintiffs,

v.

Richard W. RILEY, Secretary of United
States Department of Education, in
his official capacity, Defendant.

No. 96 C 6560.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 10, 1997.

Janice Levy Block, Christopher Eric
Paetsch, Seyfarth, Shaw, Fairweather & Ger-
aldson, Chicago, IL, for Plaintiffs.

Samuel D. Brooks, U.S. Attorney's Office,
Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Computer Learning Center of Chicago ("CLC–Chicago") has brought this action claiming that the Department of Education wrongfully terminated it from the Federal Family Education Loan ("FFEL") and Pell Grant programs. Currently before the court are plaintiff's and defendant's cross-motions for summary judgment as to counts 1, 2 and 3 of plaintiff's complaint. For the reasons stated below, we grant defendant's motion and deny that of plaintiff.

### DISCUSSION

The U.S. Department of Education administers federal financial assistance programs, including FFEL and Pell Grants, under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 et seq. To participate in such a program a school must satisfy various statutory and regulatory requirements and obtain certification as an "eligible institution." 34 C.F.R. § 682.600 (1995). Once a school obtains certification and enters into a "Program Participation Agreement" with the Department, its students can obtain FFELs from private participating lenders. 20 U.S.C. § 1071; 34 C.F.R. § 682.100. State or private agencies guarantee repayment of the loans to the lenders, and the Department, in turn, reinsures the guaranty agencies. 20 U.S.C. § 1078(b) and (c). 34 C.F.R. § 682.404. Thus, the Department bears the ultimate cost of defaulted loans.

In recent years the number of student loan defaults has increased dramatically. A Senate report shows a 338% increase in defaults between 1983 and 1989—four times greater than the increase in loan volume. Abuses in Federal Student Aid Programs, S.Rep. No. 58, 102d Cong., 1st Sess. 1 (1991). The rising costs associated with these defaults led Congress to enact the Student Loan Default Prevention Initiative Act, 20 U.S.C. § 1085 (Supp.1996). Under this Act a school "whose cohort default rate is equal to or greater than the threshold percentage [25%] . . . for each of the three most recent fiscal years for which data are available shall not be eligible

to participate" in the FFEL for a specified period of time. 20 U.S.C. § 1085(a)(2)(A) and (B). As of 1996, such institutions are also disqualified from participating in the federal Pell Grant program. See Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, § 512 (1996).

The Department determines an institution's cohort default rate by calculating the percentage of current and former students who enter repayment of their federal loans in a given fiscal year and then default on those loans by the end of the following fiscal year. 20 U.S.C. § 1085(m)(1)(A).[1] Under the current version of the statute and regulations, guaranty agencies must notify the Department of all student loan defaults for a given year by a specified date. From this information the Department calculates a "draft cohort default rate" for each institution and sends it, along with a copy of the data sent by the guaranty agencies, to those institutions that have a draft rate of over 20%. 34 C.F.R. § 668.17(h) (1995). The institution is then given thirty days in which to "review and correct" the information and notify the guaranty agency of any errors. Id. at § 668.17(h)(2); 20 U.S.C. § 1085(m)(1)(A). If the school does not identify errors at this stage of the proceeding it loses its right to assert such errors in an appeal of the Department's final default rate determination. 34 C.F.R. § 668.17(c)(7). After receiving the school's challenge and the guaranty agency's response, the Department then calculates an official cohort default rate, which is used to determine eligibility for participation in the FFEL and Pell Grant programs.

When an institution's cohort default rate exceeds the statutory threshold for three years in a row the Department notifies it of its loss of eligibility to participate in the FFEL and Pell Grant programs. 20 U.S.C. § 1085(a)(2)(A). The institution then has 30 days to file an appeal of this determination, and the Department is required to decide the appeal within 45 days after the appeal is filed. Id. Under the current regulations the

---

1. This method of calculating the cohort default rate only applies to schools for which 30 or more current or former students enter repayment in a given year. See § 1085(m)(1)(C).

Department allows disqualified institutions to continue participating in the FFEL and Pell Grant programs while the appeal is pending. 34 C.F.R. § 668.17(c)(7). Despite the statutory requirement that appeals be decided within 45 days, they often remain pending for from 12 to 24 months.

The Department's inability to decide appeals in a timely manner has led it to adopt a fairly questionable policy that has, in turn, led to the present litigation. The Department has decided that if an institution's appeal is still pending when the official cohort default rate for the following year is published, and the new default rate is below the statutory threshold, the new year will be treated as one of the "three most recent fiscal years for which data are available." Thus, some institutions whose default rates exceed the statutory threshold for three straight years are allowed to retain their eligibility, while others are not. The only difference between the winners and the losers is the Department's relative tardiness in deciding their appeals.

Plaintiff CLC–Chicago is one of the losers in the Department's appeals lottery. In 1995 the Department informed plaintiff that it was no longer eligible to participate in the FFEL program because its cohort default rates for the years 1991, 1992, and 1993 exceeded the statutory threshold. Plaintiff appealed this decision and the appeal remained pending until September 26, 1996, at which time it was denied. In the meantime, the Department sent plaintiff a draft cohort default rate for 1994 of approximately 20%, which was below the statutory threshold rate for that year. On August 2, 1996, almost two months before the Department decided its pending appeals, plaintiff informed the Department that it would not seek corrections of the draft default rate. Nonetheless, because the Department's policy is to issue official cohort default rates for all participating institutions simultaneously (the statutory direction is to publish at least once a year), plaintiff's official cohort default rate was not issued until January 6, 1997. Thus, although plaintiff's 1994 cohort default rate was below the 25% statutory threshold, it lost its eligibility to participate in FFEL and Pell Grant programs.

Plaintiff claims that the Department's policy of giving an extra chance to those institutions whose new official cohort default rate is issued while appeals are pending, but not to anyone else, exceeds the Department's statutory authority, is *ultra vires* and violates the express provisions of 20 U.S.C. § 1085 and the Equal Protection Clause of the U.S. Constitution. It also violates 20 U.S.C. § 1232(c), which requires that "[a]ll regulations shall be uniformly applied and enforced throughout the fifty states." Both parties move for summary judgment as to these claims. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir.1990). We will make all reasonable factual inferences against summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970).

■ Plaintiff's first argument is that the Department's policy violates the express terms of the statute. Eligibility determinations must be based on the "three most recent fiscal years for which data are available." The 1994 data were clearly "available" before plaintiff's appeals were decided, since a draft cohort default rate had already been calculated and plaintiff had registered no objections to it. The Department counters that the draft cohort default rate is based on raw information and there is no "available data" until the Department makes its final default calculation. We cannot say that this interpretation violates the clearly expressed meaning of the statute, or that it is an impermissible reading of an ambiguous term. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984). It is the prerogative of the Department to determine when information is sufficiently reliable to be considered "available data." The Department has decided that the information received from guaranty agencies may only be relied upon after it has gone through the entire review pro-

cess, including a second rate calculation. Although there is some controversy as to the relative reliability of the draft and official cohort default rates, this controversy is not material to our decision. It is not our role to step in and re-weigh the evidence. Nor is it material that the Department continues to recalculate cohort default rates after publishing them as official. The fact that the Department continues to review the accuracy of its calculations after publishing them does not make its decision to give them legal effect upon publication any less valid. The Department's implementation of the statute is neither illegal, *ultra vires,* nor in excess of statutory authority.[2]

■ Nor does the Department's policy violate the Equal Protection Clause. A classification in a case such as this "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rationale for the classification." *F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). The Department has identified two reasons for the distinction between institutions whose official cohort default rate has been published and institutions that have merely received a draft default rate. The first is that the information on which the draft rates are based is not sufficiently reliable to make eligibility determinations. The second is that it would be administratively difficult to speed up the review process for those institutions that elect not to challenge the draft default rate. Both rationales provide enough support to the classification to withstand an equal protection challenge.

■ Finally, plaintiff has pointed to three separate settlement agreements in which the Department has agreed to treat arguably unofficial cohort default rates as official for the purposes of determining FFEL eligibility. Plaintiff argues that the Department's decision to treat the schools involved in those settlements differently from plaintiff violates either the Equal Protection Clause or 20 U.S.C. § 1232(c), which requires the Department to apply its regulations uniformly throughout the country.

The settlement of a disputed claim is not evidence of the claim's validity, nor are three settlements out of several thousand cases evidence of uneven application of the statute. The Department has introduced evidence distinguishing those settlements from the case at hand, and showing that they were made in good faith for legitimate reasons. *See* Porter Dec. ¶¶ 2 29–31; Longanecker Dec.; Porter Supplemental Dec. ¶ 3. This is sufficient to satisfy both the Equal Protection Clause and 20 U.S.C. § 1232(c). The Department must have the flexibility to settle particular cases in furtherance of the overall purposes of the statute without having to worry that a court will transform the settlement into a "policy."

The aspect of the Department's policy that appears possibly to be "arbitrary and capricious" is its decision to allow those institutions whose appeals are pending when the new cohort default rates are published to retain their eligibility. The statute may not give the Department the authority to do this. But this issue is not before us and plaintiffs cannot complain that they did not receive a benefit that should perhaps not have been given to anyone.

### CONCLUSION

For the foregoing reasons we grant defendant's motion for summary judgment as to counts 1, 2 and 3 of plaintiff's complaint, and we deny plaintiff's summary judgment motion.

2. We further note that adoption of plaintiff's view could cause other statutory conflicts. The draft default rate is calculated to assist institutions in reviewing data given to them pursuant to 20 U.S.C. § 1085(m)(1)(A), which requires that they be given a "reasonable opportunity ... to review and correct errors in the information required to be provided to the Secretary by the guaranty agency for the purposes of calculating a cohort default rate for such institution *prior to the calculation of such rate* " (emphasis added). To give the draft rate legal effect as an official rate would violate the statutory direction that the initial review of agency data take place before the calculation of the official rate.