## AMERICAN INSTITUTE OF DESIGN, et al.

v.

## Richard W. RILEY, Sec'y of the United States Dep't of Education.

### Civil Action No. 96–6434.

United States District Court, E.D. Pennsylvania.

June 24, 1997.

938

Peter S. Leyton, Ritzert & Leyton, P.C., Fairfax, VA, Paul J. Giordano, Monteverde and Hemphill, Philadelphia, PA, for plaintiffs.

David H. Resnicoff, James G. Sheehan, U.S. Attorney's Office, Philadelphia, PA, James D. Gette, U.S. Dept. of Educ., Office of General Counsel, Washington, DC, for defendant.

K. Kevin Murphy, Harrisburg, PA, for movant.

## MEMORANDUM AND ORDER

YOHN, District Judge.

This action was commenced by several post-secondary proprietary schools after the Secretary of Education terminated them from participation in the Federal Family Education Loan program. The plaintiffs have sought judicial review of this final decision of the Secretary of Education pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702–06. The only remaining plaintiff,[1] McCarrie Schools of Health Sciences & Technology, Inc. ("McCarrie") has filed its brief in support of its argument on the merits in this case, which the court will treat as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Secretary of Education has also filed a brief on the merits which the court will treat as a cross motion for summary judgment.[2] Because the plaintiff has failed to demonstrate that the Secretary's actions in terminating it from participation in the program were arbitrary, capricious, or otherwise contrary to law, the defendant is entitled to summary judgment.

---

1. By order dated November 18, 1996, plaintiffs New Castle School of Trades and Thompson Learning Corporation were dismissed from this action. Plaintiffs' counsel has informed the court that American Institute of Design, Inc. and Craft Educational, Inc. also wish to be dismissed from the case without prejudice. The court will so order.

2. The parties agreed that the best method to resolve this administrative appeal was for each party to file a brief in support of its argument on the merits. The court confirmed this agreement by letter to the parties dated December 19, 1996. These "briefs" are the equivalent of cross motions for summary judgment which is how the court will dispose of the matter.

## BACKGROUND

McCarrie is a Delaware corporation which provides educational training to students in several specialized fields relating to the medical arts. Students who graduate from McCarrie receive either an Associate in Specialized Technology degree or an Associate in Specialized Business degree. Most of McCarrie's students are economically disadvantaged, and rely heavily on federally subsidized loans in order to finance their education.

Under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq.*, eligible educational institutions are entitled to participate in several federally sponsored student loan programs, including the Federal Family Education Loan ("FFEL") program. The FFEL program includes "Stafford" loans for students and "PLUS" loans for parents.

FFEL loans are not issued directly by the federal government. Rather, participating lending institutions, such as banks, savings and loan associations, and credit unions make the loans directly to the students. These loans are then "guaranteed" by participating state guaranty agencies. The guaranty agencies are, in turn, guaranteed payment by the United States Department of Education ("Department"). *See generally* 20 U.S.C. § 1078(b)-(c); 34 C.F.R. § 682.100 *et seq.* (1996).

Before a lender may seek payment from its guaranty agency on a defaulted loan, lenders are required to demonstrate to the guaranty agency that they have performed certain "due diligence" procedures. *See* 34 C.F.R. § 682.411 (specifying due diligence required by lending institutions). The guaranty agencies are expected to ensure that such due diligence has occurred before paying claims to lenders and requesting payment from the federal government. *See* 20 U.S.C. § 1078(c)(2)(A); 34 C.F.R. § 682.406(a)(3).

In 1990, Congress amended the HEA to require termination of schools from participation in Title IV programs if they have an exceptionally high percentage of students in default on their federal loans. The amendments require the Secretary of Education ("Secretary") to calculate a cohort default rate ("CDR") for each school on a yearly basis. *See* 20 U.S.C. § 1085(m)(4). The CDR essentially measures the percentage of those current and former students entering repayment in a fiscal (or "cohort") year who default on their loan in that fiscal year or the following fiscal year. *See* 20 U.S.C. § 1085(m)(1). "An institution whose cohort default rate is equal to or greater than [25%] for each of the three most recent years for which data are available" becomes ineligible to participate in the FFEL program. 20 U.S.C. § 1085(a)(2).

Cohort default rates are calculated by accumulating data collected from the guaranty agencies reflecting guaranty payments made for defaulted loans for students at each participating school. Before the Department calculates a final cohort default rate from this data, the schools are provided with a pre-publication rate. *See* 20 U.S.C. § 1085(m)(1)(A); 34 C.F.R. § 668.17(j). The pre-publication rate allows schools to examine the data used to calculate their CDR and to contest the accuracy of that data with their relevant guaranty agency. *See id.* If the guaranty agency agrees that some of the data used to calculate the school's CDR were inaccurate, and the Secretary accepts such findings, the information is corrected before a final CDR is published by the department. *See* 34 C.F.R. § 668.17(j)(5).

If an institution's published CDR is 25% or greater for each of the last three fiscal years for which data are available, the institution is notified by the department that it is no longer eligible to participate in the FFEL program. *See* 20 C.F.R. § 668.17(b). Once the school receives that notification, it has 30 days in which to file an appeal of the Department's decision to terminate the school from the program. *See* 34 C.F.R. § 668.17(c); *see also* 34 C.F.R. § 668.17(b)(6) (allowing a school to continue to participate in FFEL programs pending the resolution of its properly filed appeal). Appeals to the Secretary may be based on one or more of three grounds: (1) that the CDR for any of the three fiscal years includes erroneous or incorrect data, *see* 20 U.S.C. § 1085(a)(2)(A)(i), (2) that there are exceptional mitigating circumstances that would make disqualification

based on excessive cohort default rates inequitable, *see* 20 U.S.C. § 1085(a)(2)(A)(ii), and (3) that the data for any of the three fiscal years includes loans "which, due to improper servicing or collection would ... result in an inaccurate or incomplete calculation of such cohort default rate." 20 U.S.C. § 1085(m)(1)(B); *see* 20 U.S.C. § 1085(a)(3).

In February of 1996, the Department issued official cohort default rates for fiscal year 1993.[3] Because McCarrie's 1991, 1992 and 1993 cohort default rates were each above 25%, the school was informed in February 1996 that it was no longer eligible to participate in the FFEL program. McCarrie filed timely appeals based, *inter alia,* on improper loan servicing with regard to the 1993 CDRs, inclusion of erroneous data with regard to the 1991 CDRs, and a mitigating circumstances appeal based on the 1993 CDRs. McCarrie had previously filed a mitigating circumstances appeal based on its 1992 cohort default rate.

While its appeals were pending, McCarrie received its pre-publication rate for its fiscal year 1994 cohort default rate. In May 1996, the Department informed McCarrie that its pre-publication rate was 16.4%, well below the 25% threshold. Although McCarrie had hoped that this rate would be made final before the Department resolved its pending appeals, thus making one of the three most recent official CDRs below 25%, the 1994 cohort default rates were not made official until January 8, 1997.

3. Due to the fact that calculation of CDRs takes a fair amount of time and effort, it takes the Department approximately two years to issue a CDR after the close of any given fiscal year.

Official CDRs for fiscal year 1993 were originally published in November of 1995 (fiscal year 1996). No CDRs were published in fiscal year 1994, despite the command of 20 U.S.C. § 1085(m)(4)(C) that the Secretary is to publish CDR data at least once every fiscal year. The publication of fiscal year 1993 CDRs was further complicated by the fact that the Department rescinded the official 1993 CDR rates in November of 1995. It was not until February of 1996 that the Department finally reissued the official 1993 cohort default rate data.

4. Termination of a school is effective upon receipt of the letter notifying the school that all of its appeals have been resolved unfavorably. *See*

On August 30, 1996, McCarrie received a letter from the Department resolving its 1993 loan servicing appeal. Based on the loan servicing appeal, the Department revised McCarrie's 1993 CDR from 35.9% to 35.5%—still well above the 25% threshold. On August 30, 1996, McCarrie also received a letter from the Department rejecting its 1993 mitigating circumstances appeal. On September 26, 1996, McCarrie received a letter from the Department dismissing its 1992 mitigating circumstances appeal as moot. Finally, on September 30, 1996, McCarrie received a letter from the Department resolving its 1991 erroneous data appeal. Although the Department did make several minor changes to the school's cohort default rates for fiscal years 1990–1993, McCarrie's CDR for each of the three most recent fiscal years was still greater than the 25% threshold. McCarrie's participation from the FFEL programs was, therefore, terminated upon receipt of this letter.[4]

Plaintiff, along with several other schools which had been terminated from the FFEL program, filed suit in this court on September 23, 1996 seeking review of the Secretary's actions under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702 *et seq.* This court denied the plaintiff's motion for a preliminary injunction on December 11, 1996.[5] Only McCarrie remains as a plaintiff in the suit. The parties having provided briefing on the merits, the court is now prepared to enter judgment.

*Advanced Career Training v. Riley,* Civ. No. 96–7065, 1997 WL 214863 at *3 n. 6 (E.D.Pa. Apr.24, 1997).

5. The plaintiff requested expedited treatment of its preliminary injunction motion and therefore agreed that the court need not make findings of fact or conclusions of law. Plaintiff thereafter apparently changed its mind and filed a motion requesting the court to issue findings of fact and conclusions of law. The court granted that motion by order dated January 21, 1997.

This opinion will serve as the court's findings with regard to the court's denial of the preliminary injunction. For the reasons expressed in this court's opinion in *Advanced Career Training v. Riley,* Civ. No. 96–7065, 1997 WL 214863 (E.D.Pa. Apr.24, 1997), the court lacked authority to issue the injunction under 20 U.S.C. § 1082(a)(2).

## DISCUSSION

### I. Standard of Review

McCarrie raises a host of issues in its brief which the court will address in turn. It is first necessary, however, to set out the appropriate standard of review of administrative action under the Administrative Procedures Act.

The Administrative Procedures Act provides for judicial review of final agency action, unless another statutory provision specifically precludes such review. *See* 5 U.S.C. § 702; *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971). The parties agree that the Secretary's actions in this case are subject to review under this provision. The scope of such review is, in the first instance, dictated by statute:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

In the seminal case of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court announced a two step inquiry which must be made when an agency's action under a statute is challenged:

> When a court reviews an agency's construction of the statute it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

Thus, unless the statutory provision clearly speaks to the issue, the court must defer to an agency's reasonable interpretations of how the statute is to be applied in a given case. *See id.*

Further, when an agency is operating under a statute which grants it discretion in a decision making process, "a court, in reviewing informal agency action,[6] 'is not entitled to substitute its judgment for that of the agency.'" *C.K. v. New Jersey Dep't of*

---

**6.** The parties appear to agree that the Secretary's actions in this case constitute "informal agency action" and are subject to review under the "arbitrary and capricious" standard.

*Health and Human Services*, 92 F.3d 171, 181 (3d Cir.1996) (quoting *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24). Agency action "is entitled to a presumption of regularity." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. Nonetheless, the district court is required to conduct a "substantial inquiry." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823.

[T]his "substantial inquiry" is pursuant to APA "arbitrary or capricious" review: "Agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'...." The APA thus requires a finding that the actual choice made was neither arbitrary nor capricious. To make this finding, the court must confine its review to the "full administrative record that was before the Secretary at the time he made his decision," and "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

*C.K.*, 92 F.3d at 182 (internal citations omitted).

In determining whether an agency action is "arbitrary or capricious" the court must determine whether the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manuf. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

II. Failure to Treat 1994 Pre–Publication Rate as One of the Three Most Recent Years for Which Data Were Available

A. *When Data are "Available"*

 McCarrie first argues that the Secretary has violated the Higher Education Act and acted in an arbitrary and capricious manner by failing to treat its 1994 pre-publi-cation rate as one of the "three most recent years for which data are available." 20 U.S.C. § 1085(a)(2)(A). McCarrie argues that the data required to calculate the 1994 CDRs were "available" when the pre-publication rate was issued and that, because McCarrie's pre-publication rate was below 25%, the Department should have determined that the school's CDR for each of the last three fiscal years was not, in fact, over 25%.

The Department responds that data are not "available" under the statute until the Secretary is prepared to issue official cohort default rates. Here, the Department was not prepared to issue final cohort default rates for fiscal year 1994 until January, 1997. The Department therefore argues that McCarrie was properly terminated from the program as the 1994 data were not available until after the Secretary resolved McCarrie's appeals.

20 U.S.C. § 1085(m)(1)(A) provides:

The Secretary shall require that each guaranty agency that has insured loans for current or former students of the institution afford such institution a reasonable opportunity (as specified by the Secretary) to review and correct errors in the information required to be provided to the Secretary by the guaranty agency for the purposes of calculating a cohort default rate for such institution, prior to the calculation of such rate.

20 U.S.C. § 1085(m)(1)(A). Following this statutory directive, the Secretary has promulgated regulations establishing the pre-publication rate process. *See* 34 C.F.R. § 668.17(j).

Despite plaintiff's claims to the contrary, there is nothing in the statute or regulations which requires the Secretary to treat McCarrie's pre-publication rate as one of the three most recent fiscal years for which data are available. Indeed, the statutory provision makes it quite clear that the purpose of issuing a pre-publication rate is to correct any erroneous data *"prior to the calculation"* of the CDR. 20 U.S.C. § 1085(m)(4). During this pre-publication period, the data being used to calculate the school's CDR are being fine tuned and corrected. "It is the preroga-

tive of the Department to determine when information is sufficiently reliable to be considered 'available data.' The Department has decided that the information received from guaranty agencies may only be relied upon after it has gone through the entire review process, including a second rate calculation." *Computer Learning Ctr., Inc v. Riley,* 962 F.Supp. 108 (N.D.Ill.1997); *see Ross Learning, Inc. v. Riley,* 960 F.Supp. 1238, 1243–44 (E.D.Mich.1997); *see also Advanced Career Training,* 1997 WL 214863 at *8–9. The Secretary's refusal to treat the 1994 data as "available" until the official rate is published, if not mandated by the terms of 20 U.S.C. § 1085(m)(4), is certainly a "permissible construction" of the Higher Education Act. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82.

### B. *Failure to Issue Fiscal Year 1994 CDRs during Fiscal Year 1996*

■ Plaintiff argues that the Secretary has also acted arbitrarily, capriciously and contrary to law by failing to finalize the 1994 cohort default rate data before the end of fiscal year 1996 and by failing to timely resolve McCarrie's administrative appeals. Plaintiff argues that the HEA required the Department to publish the 1994 cohort default rate by the end of fiscal year 1996. If the Department had done so, the rate would have been issued before the Department resolved McCarrie's appeals on the last day of fiscal year 1996 and the school would not have had a CDR above 25% for each of the three most recent fiscal years for which data were available because its 1994 CDR would have been below 25%.

20 U.S.C. § 1085(m)(4)(C) states: "The Secretary shall publish not less often than once every fiscal year a report showing default data for each institution for which a cohort default rate is calculated under this subsection." Although not completely free from ambiguity, the court will assume for purposes of discussion that McCarrie is correct in its contention that this provision requires the Secretary to issue a cohort default rate at least once every fiscal year.

It is true that the Secretary failed to issue a cohort default rate during fiscal year 1995—instead the cohort default rates for fiscal year 1993 were issued during fiscal year 1996. The cohort default rates for 1994 were, in turn, issued during fiscal year 1997. But even accepting the proposition that, under the text of the HEA, the Secretary should have published CDRs for fiscal year 1993 before the end of fiscal year 1995 and that he should, in turn, have issued CDRs for fiscal year 1994 before the end of fiscal year 1996, McCarrie is not entitled to relief.

First, there is no evidence that the Secretary acted in bad faith in publishing the rates in an untimely manner or that he in any way manipulated the timing of the publication to intentionally prejudice this or any other school. Rather, the Department, due in part to forces outside of its control[7] and in part to mismanagement, was simply unable to complete the process of calculating CDRs in the time frame provided by Congress. The Supreme Court has "held that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 63–65, 114 S.Ct. 492, 506, 126 L.Ed.2d 490 (1993). Thus, although the court cannot condone the mismanagement which has occurred within the Department of Education, *see Computer Learning Ctr. Inc.,* 962 F.Supp. 108, 109–10 (calling the Secretary's policy "fairly questionable"), Congress's failure to provide a remedy to plaintiffs such as McCarrie precludes this court from invalidating the Secretary's actions merely because he failed to meet a statutory time limit. *See United States v. Montalvo–Murillo,* 495 U.S. 711, 721, 110 S.Ct. 2072, 2079, 109 L.Ed.2d 720 (1990) ("We do not agree that we should, or can, invent a remedy to satisfy some perceived need to coerce the courts and the Government into complying with statutory time limits."); *Brock v. Pierce County,* 476 U.S. 253, 260, 106 S.Ct. 1834, 1839, 90 L.Ed.2d 248 (1986) ("We would be most reluctant to conclude that every failure of an

7. The court takes judicial notice of the fact that large portions of the government were shut down for short periods of time during the budget crisis of 1995.

944

agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.").

Had McCarrie actually been prejudiced by the Secretary's imperfect timing, the court would, perhaps, be more reluctant to conclude that Congress intended to provide it no remedy. It is quite clear, however, that the plaintiff had no right to expect that its 1994 cohort default rate would become final before the Secretary resolved its pending appeals for fiscal years 1991–1993. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1443 (10th Cir.1992) ("The harmless error rule applies to judicial review of administrative proceedings.").

Had the Secretary followed the timing guidelines of the statute to the letter (as interpreted by McCarrie), he would have been required to issue the official fiscal 1993 cohort default rate by the end of fiscal year 1995—September 30, 1995. If the Secretary had issued the official 1993 CDRs in September 1995, rather than February 1996, the plaintiff would have been informed of its loss of eligibility in September 1995 rather than February 1996, and would have had thirty days to file an appeal from September 1995, rather than February 1996. *See* 34 C.F.R. § 668.17(c)(1) (institution must file appeal within 30 days of notification of loss of eligibility); *see also* 34 C.F.R. § 668.17(h)(2) (improper loan servicing appeal procedures containing slightly different time frames). In other words, the plaintiff's appeals would have been due five months earlier than they were actually due. Further, if the court were to enforce the timing provision in § 1085(m)(4), the Secretary would also be required to follow the 45 day time limit to decide appeals under 20 U.S.C. § 1085(a)(2)(A). Thus, if McCarrie is prepared to argue that the Secretary should

have followed the timing dictates of the HEA, McCarrie would have had its appeals resolved in early 1996 rather than just before the end of fiscal year 1996. Because the Secretary would be under no obligation to publish the official 1994 rates until September, 1996, McCarrie would have lost its eligibility even if the Secretary had followed the timing regulations of the statute.

McCarrie's argument attempts to fault the Secretary's failure to follow the timing dictates of § 1085(m)(4) while simultaneously taking advantage of the Secretary's failure to follow the timing dictates of § 1085(a)(2)(A). This it cannot do. The reality of the situation is that McCarrie's cohort default rate was, for three consecutive years, greater than 25%. The court cannot find that the Secretary's actions in terminating McCarrie from participation were "arbitrary or capricious" when it is quite clear that termination of such a school is exactly what Congress intended by the 1990 amendments to the Higher Education Act.

## C. *20 U.S.C. § 1232(c)*

■ Plaintiff's final argument within the context of its 1994 pre-publication rate is that the Secretary has violated 20 U.S.C. § 1232(c) which provides: "All regulations shall be uniformly applied and enforced throughout the 50 states." 20 U.S.C. § 1232(c). McCarrie claims that the Secretary has, in litigation settlements involving other proprietary schools, agreed to treat the prepublication rate as "final" and thereby allow the schools to continue participation in the FFEL programs.[8]

■ I will, for the purposes of discussion, assume that the Secretary did, in cases similar to the one at bar, agree to treat a prepublication rate as final in the context of the settlement of litigation.[9] I agree with the

---

8. In a telephone conference with the court, the parties agreed to limit the record the court was to consider to the administrative record and the testimony and exhibits presented at the preliminary injunction hearing. This agreement was confirmed in the December 19, 1996 letter from the court to the parties. Plaintiff has not directed the court to any evidence of record which

supports its contention that the Secretary has treated similar schools disparately.

9. This assumption is doubtful in light of the explanation provided by the Secretary in his brief. The Secretary argues that the situations where the Department agreed to treat a pre-publication rate as final are distinguishable on their facts from the case at bar. However, given the Secre-

two other courts to have considered this issue, however, that "[t]he settlement of a disputed claim is not evidence of the claim's validity, nor are three settlements out of several thousand cases evidence of uneven application of the statute." *Computer Learning Ctr.,* 962 F.Supp. 108, 111; *Ross Learning,* 960 F.Supp. 1238, 1246–47; *cf. C.K.,* 92 F.3d at 187 ("We ... recognize that the Secretary, in her discretion, is allowed to change her mind over time regarding the wisdom of certain programs."). I therefore conclude that 20 U.S.C. § 1232(c) was not meant to tie the Secretary's hands in effecting settlement of disputed claims and reject the plaintiff's claim that the Secretary has violated § 1232(c).

### III. Department's Refusal to Consider McCarrie's 1992 Mitigating Circumstances Appeal

McCarrie next argues that the Secretary violated the HEA and acted in an arbitrary and capricious manner when he dismissed McCarrie's 1992 mitigating circumstances appeal as moot. In a letter received by McCarrie on September 26, 1996, the Department informed McCarrie: "Your school appealed ... loss of participation based upon exceptional mitigating circumstances [for fiscal year 1992]. Because new cohort default rates for FY 1993 were issued in February 1996, your school's FY 1992 mitigating circumstances appeal is now moot and the Department will take no further action on it." Administrative Record ("A.R.") at 63026.

Although nowhere expressed in the Department's regulations, it is apparently the Department's policy to require a mitigating circumstances appeal to be filed for each year in which a school faces discontinuation in the FFEL program, because a mitigating circumstances appeal challenges the institution's loss of eligibility, not the accuracy of the underlying cohort default rate. In other words, if a mitigating circumstances appeal is

granted for any given year in which the school faces loss of eligibility, the institution receives a reprieve for that year only—the institution must file another mitigating circumstances appeal if its CDR for the following year is also above 25%. Following this policy, the Department argues that it was not required to rule on McCarrie's 1992 mitigating circumstances appeal because, given the fact that McCarrie had continued to participate in the FFEL program until the 1993 rates were released, the plaintiff already received all of the benefit it would have received had it won the 1992 mitigating circumstances appeal—continued participation until publication of the 1993 rates.[10]

McCarrie disagrees with the Secretary's interpretation of the statute. In McCarrie's view, once the Department grants a mitigating circumstances appeal, the three year "chain" is broken, and the year for which the appeal was granted is no longer considered in assessing whether the school's CDRs for each of the last three fiscal years is over 25%. Rather, in McCarrie's view, if it had won its mitigating circumstance appeal for its fiscal year 1992 rate, that rate would not have been considered above 25% in assessing its continued eligibility under 20 U.S.C. § 1085(a)(2) when the 1993 rates were published.

The resolution of this dispute is purely one of statutory interpretation, and is apparently one of first impression.

20 U.S.C. § 1085(a)(2)(A) provides:

> An institution whose cohort default rate is equal to or greater than [25%] for each of the three most recent fiscal years for which data are available shall not be eligible to participate in a program under this part for the fiscal year for which the determination is made and for the two succeeding fiscal years, unless, within 30 days of receiving notification from the Secretary of loss of eligibility under this paragraph, the

---

tary's reluctance to provide the plaintiff with discovery on this issue, and the Secretary's continuing litigation position in this case that the court's consideration must be confined to the administrative record, the court will not consider the Secretary's explanation because it would constitute extra-record evidence.

10. As noted earlier, McCarrie did file a mitigating circumstances appeal for its fiscal year 1993 rate. That appeal was denied on the merits by letter received by McCarrie on August 30, 1996. McCarrie has not challenged the Secretary's denial of that appeal.

institution appeals the loss of its eligibility to the Secretary. The Secretary shall issue a decision on any such appeal within 45 days after its submission. Such decision may permit the institution to continue to participate in a program under this part if—

(i) the institution demonstrates to the satisfaction of the Secretary that the Secretary's calculation of its cohort default rate is not accurate, and that recalculation would reduce its cohort default rate for any of the three fiscal years below the threshold percentage specified in subparagraph (B); or

(ii) there are, in the judgment of the Secretary, exceptional mitigating circumstances that would make the application of this paragraph inequitable.

20 U.S.C. § 1085(a)(2)(A).

While the statute is silent as to the effect of a successful mitigating circumstances appeal should a school in a subsequent year again have a cohort default rate above 25%, the court "must defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering." *Smiley v. Citibank,* —— U.S. ——, ——, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996); *Teitelbaum v. Chater,* 949 F.Supp. 1206, 1214–15 n. 7 (E.D.Pa.1996). The Secretary's interpretation of the statute in this case is not only a "permissible construction" of the statute, *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82, it is also the most reasonable interpretation of the statute.

Unlike § 1085(a)(2)(A)(i) relating to erroneous data appeals, and § 1085(m)(1)(A) relating to improper loan servicing appeals, § 1085(a)(2)(A)(ii) does not require the Secretary to determine that the actual cohort default rate under appeal has been improperly calculated. When a school successfully appeals a cohort default rate under an erroneous data or improper loan servicing appeal, the Department actually changes the school's cohort default rate for that year to a rate below 25%. In contrast, a mitigating circumstances appeal does not result in a change of the underlying CDR.

There is no doubt that the review process of § 1085(a)(2) is triggered every time an official set of cohort default rates is released by the Department. When a school has successfully challenged a cohort default rate based on improper loan servicing or erroneous data, say for 1992, and the 1993 rate is above 25%, the "three year" condition in § 1085(a)(2)(A) is not met because the 1992 rate has been changed below the threshold and the CDR "for *each* of the three most recent fiscal years" is not above 25%. This is how the "chain" is broken in these types of appeals.

The "chain" will not be broken for a mitigating circumstances appeal, however, because the underlying CDR for 1992 has not been changed. Thus, when a school that has been successful in challenging its 1992 rate based on mitigating circumstances is evaluated under § 1085(a)(2)(A) upon receiving an official 1993 rate which is above 25%, the school's CDR *will* be above 25% "for each of the three most recent fiscal years" because the 1992 rate is still above 25%. Under a straightforward application of the statutory language, therefore, the plaintiff's argument fails.

The Secretary's interpretation of the statute is also reasonable because the Secretary may determine that a school's right to continue to participate in FFEL programs, despite its excessive rate of loan defaults, should be judged on a yearly basis. Section 1085(a)(2)(A)(ii) places the determination of whether exceptional mitigating circumstances exist exclusively in the hands of the Secretary. *See* 20 U.S.C. § 1085(a)(2)(A)(ii) (mitigating circumstances appeal may be granted if "there are, *in the judgment of the Secretary,* exceptional mitigating circumstances . . . ." (emphasis added)); *Ross Learning. Inc. v. Riley,* 960 F.Supp. 1238, 1241 (E.D.Mich. Mar. 31, 1997) (noting vast discretion given to Secretary by this language); *see also C.K.,* 92 F.3d at 182–83 (noting that court must look to enabling statute to determine the amount of discretion given to the agency). In the exercise of this vast discretion, the Secretary may reasonably determine that circumstances which justify continued participation in 1992 may no longer be

present in 1993 such that application of the disqualification provisions of the statute would no longer be "inequitable." Certainly Congress has granted the Secretary sufficient discretion to require a showing of exceptional mitigating circumstances each year that a school faces the prospect of loss of eligibility.

Under this reasonable interpretation of the statute, the 1992 mitigating circumstances appeal could have prolonged McCarrie's participation in the FFEL program only until the 1993 cohort default rates were published. Because the school did in fact remain in the program until the 1993 rates were released, the Secretary was justified in dismissing McCarrie's 1992 mitigating circumstances appeal as moot when the 1993 rates were published.

### IV. Adequacy of Administrative Record

Plaintiff next argues that the administrative record is inadequate to support the Secretary's actions with respect to McCarrie's 1993 loan servicing appeal and 1991 erroneous data appeal. The argument lacks merit.

"The purpose of the APA provision requiring specific findings and conclusions are [sic] to prevent arbitrary agency decisions, provide parties with a reasoned explanation for those decisions, settle the law for future cases, and furnish a basis for effective judicial review." *Armstrong v. Commodity Futures Trading Comm'n,* 12 F.3d 401, 403 (3d Cir.1993) (context of action under 5 U.S.C. § 557). The Third Circuit has indicated that the facilitation of judicial review is the most important of these factors. *See id.* (citing *Wensel v. Director, Office of Workers' Compensation Programs,* 888 F.2d 14, 16 (3d Cir.1989)); *Bethlehem Steel Corp. v. Occupational Safety & Health Review Comm'n,* 607 F.2d 1069, 1073–74 (3d Cir.1979); *see also Rickards v. United States Dep't of Housing & Urban Dev't,* 623 F.Supp. 463, 467 (E.D.Pa.1985) ("When an administrative decision is subject to judicial review, the agency must indicate the grounds for its decision so that the court may properly determine whether the agency has abused its discretion.").

■ "[T]he absence of formal findings does not necessarily require that the case be remanded to the Secretary." *Citizens to Preserve Overton Park,* 401 U.S. at 408, 91 S.Ct. at 819. Our court of appeals has indicated that where, as here, an agency is granted considerable discretion in exercising informal agency action, the Secretary need not provide detailed explanations of how it reached its decision. *See C.K.,* 92 F.3d at 183. Rather, a court will find an administrative record adequate and uphold the agency's decision if it is "satisfied that the materials before the Secretary sufficed for a 'consideration of the relevant factors' by him and that there was no 'clear error of judgment' on his part." *Id.* (quoting *Aguayo v. Richardson,* 473 F.2d 1090, 1106 (2d Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974)).

■ The administrative record is adequate to show that the Secretary considered the relevant factors and that there was no clear error of judgment on his part.

#### A. *1991 Erroneous Data Appeal*

The Secretary has identified the relevant factors to be considered in an erroneous data appeal at 34 C.F.R. § 668.17(c)(1)(i). The standard is quite straightforward—a school must demonstrate that its cohort default rate includes erroneous data and, if such data were removed from the cohort default rate, the rate would be below 25%. *See id.* The administrative record reveals that each factor was considered for each contested loan on an individual basis. *See* A.R. at 61675–90, 63009–25. The cited portions of the record are worksheets used by the Secretary in evaluating erroneous data appeals. A review of these completed worksheets satisfies the court that the Department considered the "relevant factors" in resolving McCarrie's erroneous data appeal.

McCarrie argues, however, that the Secretary's refusal to include certain loans in the calculation of its 1991 cohort default rate constitutes a clear error of judgment. The court has reviewed the administrative record and determined that each of these challenged loans was either actually included in the school's 1991 CDR as requested by McCar-

rie,[11] or properly disposed of by the Department as not belonging in the school's CDR.[12] The record clearly reveals that the Secretary considered the relevant factors in deciding McCarrie's 1991 erroneous data appeal, and McCarrie has failed to show that there has been a clear error of judgment on the Secretary's part. Therefore the court "may not disturb the Secretary's decision." *C.K.*, 92 F.3d at 183.

## B. *1993 Loan Servicing Appeals*

McCarrie next claims that the administrative record regarding its 1993 Loan Servicing Appeal is inadequate, and that the Secretary acted arbitrarily and capriciously in his handling of McCarrie's appeal.

The Secretary has promulgated regulations which define the factors which the Department will consider in evaluating an appeal based on improper loan servicing. 34 C.F.R. § 668.17(h)(3)(viii) provides:

> For purposes of this paragraph, a default is considered to have been due to improper servicing or collection only if the borrower did not make a payment on the loan and the institution proves that the lender failed to perform one or more of the following activities:
>
> (A) Send at least one letter (other than the final demand letter) urging the borrower or endorser to make payments on the loan if the lender was required to send such letters;

> (B) Attempt at least one phone call to the borrower or endorser, if such attempts were required;
>
> (C) Submit a request for preclaims assistance to the guaranty agency, if such a request was required;
>
> (D) Send a final demand letter to the borrower, if required; and
>
> (E) If required, the lender did not submit a certification (or other evidence) that skip tracing was performed.

34 C.F.R. § 668.17(h)(3)(viii). This provision clearly sets out the factors which the Secretary has determined are relevant to a loan servicing appeal.

The administrative record also reveals that the Secretary considered each of these factors in evaluating McCarrie's loan servicing appeal. As with the erroneous data appeal, the administrative record contains appeal worksheets which contain a checklist for each of the five required elements found in § 668.17(h)(3)(viii). *See* A.R. at 60887–60917. These records show that each contested loan was individually evaluated by the Department to ensure that the § 668.17 factors had been met.

Plaintiff claims, however, that the actual loan servicing documents which the Department reviewed in preparing the worksheets show that the Secretary could not have considered all relevant factors because the underlying loan servicing documents provided by the guaranty agency, the Pennsylvania Higher Education Assistance Agency ("PHEAA"), are wholly inadequate.[13]

---

**11.** The following students were, despite McCarrie's unsupported argument to the contrary, included in the calculation of plaintiff's 1991 cohort default rate as demonstrated by their inclusion in the Loan Detail Report: J. Boland, *see* A.R. at 61527; E. Basset, *see* A.R. at 61530; K. Hagins (incorrectly spelled as "Hagains" in plaintiff's brief), *see* A.R. at 61533; K. Avitollo, *see* A.R. at 61534; L. Williams, *see* A.R. at 61535; S. Bell, *see* A.R. at 61544; C. Dohan (incorrectly spelled as "Donhan" in plaintiff's brief), *see* A.R. at 61541; R. Brown, *see* A.R. at 61552; W. Thomas (incorrectly designated as "W. White" in plaintiff's brief), *see* A.R. at 61552; and H. Dashiel, *see* A.R. at 61551. Further, the record also reveals that S. Rice was included in the calculation of plaintiff's 1991 cohort default rate. *See* A.R. at 63006.

**12.** The following loans are properly documented by the Department as being excluded from calculation of McCarrie's 1991 CDR, and the court cannot say that their exclusion constitutes a clear error of judgment: Y. Harris, *see* A.R. at 63019 (record reveals that department determined loan had been cancelled); C. McCauley, *see* A.R. at 63020 (record reveals that department determined that incorrect information was originally used as to last date of attendance); W. Pieczara, *see* A.R. at 63011 (record reveals that student never obtained a federal loan).

**13.** In its brief on the merits, plaintiff also raises, for the very first time, the contention that certain loan servicing records provided by the guaranty agency are illegible. The court reviewed the documents cited by the plaintiff in footnote 10 of the plaintiff's brief on the merits. Though difficult to read, the documents are not illegible.

McCarrie claims that "the perfunctory codes reflected on the loan servicing records fail to demonstrate that the requisite due diligence steps were adequately performed." *Pl.'s Br. on the Merits* at 48.

As an initial matter, McCarrie appears to be confusing the due diligence requirements of 34 C.F.R. § 682.411 with the loan servicing appeal regulations found in 34 C.F.R. § 668.17. As the Secretary explained when promulgating the loan servicing appeal regulations:

> Many commenters [who sought to equate the § 668.17 appeal standards with the due diligence requirements in § 682.411] misunderstand the purpose of 34 CFR 682.411. The requirements in 34 CFR 682.411 are designed to ensure that lenders and guaranty agencies receiving FFEL Program benefits ... take certain collection actions in regard to the loans. These requirements have never been intended to set forth standards which, if not followed in their entirety, would excuse borrowers who refuse to repay their loans. Similarly, they are not intended to provide protection for institutions that fail to meet the statutory requirement for continued participation in the FFEL Program.

59 Fed.Reg. 61,194 (1994).

█ Thus, the Secretary in promulgating § 668.17 determined that a loan would not be considered to be in default "due to" improper loan servicing unless the school proves that one of the five important factors listed in that regulation is lacking. *See id.* To the extent plaintiff argues the Secretary failed to consider the due diligence requirements of § 682.411, the argument is irrelevant as those considerations are not factors to be considered by the Secretary in resolving loan servicing appeals.[14]

McCarrie also claims that the codes, standing alone, do not demonstrate that the required elements in § 668.17 have been performed. For example, plaintiff claims that the Department was required to contact PHEAA "ex parte" in order to determine the meaning of certain codes. The Department admits that some analysis was required to

determine whether certain codes actually satisfied the requirements of § 668.17, such as cross references between loan servicing documents to determine whether a final demand letter had been sent in some cases. *See Sec'y's Br. on the Merits* at 49. The Secretary argues, however, that through this analysis the PHEAA data provide sufficient information to determine whether the requirements of § 668.17 have been met.

The fact that the Secretary did not explain on the record every step of his analysis in concluding that each of the required factors in § 668.17 had been met does not require this court to remand the case for further consideration. As the court of appeals stated in *C.K.*:

> We agree with the district court that, given the fact that prior to making her decision ... the Secretary had before her extensive materials ... precedent allows us to give the Secretary the benefit of the doubt and conclude that she did consider [those factors in reaching a conclusion].... In this case ... the Secretary had sufficient data, including information and arguments addressing all the pertinent issues, to consider the factors relevant to her decision.... We will not assume that the Secretary has ignored the materials presented in contravention of the [plaintiff's] position simply because, in the end, she was not persuaded by them.

*C.K.,* 92 F.3d at 185.

The Secretary concluded that the codes on the loan servicing documents, when supplemented with PHEAA's explanation as to the meaning of those codes, *see* A.R. at 60065 (letter to McCarrie copied to Department explaining meaning of codes), provided him with sufficient information to determine whether the factors in § 668.17 had been met. The court cannot say that the Secretary's conclusion that he had sufficient data before him to resolve the plaintiff's appeal was a "clear error of judgment." *C.K.,* 92 F.3d at 183.

In sum, the court finds that the plaintiff has failed to meet its burden of proving that the Secretary has acted arbitrarily or capri-

---

14. Plaintiff does not challenge the reasonable- ness of 34 C.F.R. § 668.17.

ciously in resolving its 1993 loan servicing appeal on the basis of the record before him. *See Frisby v. United States Dep't of Hous. & Urban Dev't*, 755 F.2d 1052, 1055 (3d Cir. 1985) ("Agency action is entitled to a presumption of regularity. The burden of proof rests with the party alleging irregularity."). While the plaintiff argues that the Secretary cannot determine that each of the elements in § 668.17 has been performed from the records provided by PHEAA, the Department has provided the court with a satisfactory explanation of how each of the elements *could* be determined from the record provided to both the school and the Department by PHEAA. Given the Secretary's explanation, and the court's independent review of the administrative record, it is clear that the Secretary has not committed a "clear error of judgment" in his analysis of the extensive data before him. The Secretary's analysis is entitled to the "benefit of the doubt," *C.K.*, 92 F.3d at 185, and I conclude that the records provided by PHEAA were adequate to determine that each of the elements in § 668.17(h)(3)(viii) had been performed.[15]

### V. Failure to Provide Adequate Loan Servicing Records

█ The court's conclusion that the records provided by PHEAA were sufficient to determine whether the elements specified in § 668.17(h)(3)(viii) had been performed disposes of the plaintiff's argument that the Secretary violated the HEA by failing to provide it with adequate loan servicing records in preparing its appeal. If the records were sufficient for the Department to determine that the required elements were present, they were also adequate for McCarrie to make the same conclusion.

To the extent the plaintiff argues that the Secretary was also required to provide it with the original loan servicing and collection records from the loan servicers and lenders, *see* 20 U.S.C. § 1085(a)(3)(C), I disagree in light of my conclusion that the records were, in fact, adequate.

Section 1085(a)(3)(C) provides:

the Secretary shall take whatever steps are necessary to ensure that such institution has access to a representative sample (as determined by the Secretary) of the relevant loan servicing and collection records of the guaranty agencies *and loan servicers* for a reasonable period of time, not to exceed 30 days.

20 U.S.C. § 1085(a)(3)(C) (emphasis added).

As an initial matter, plaintiff never requested the Secretary's aid in obtaining loan servicing and collection records directly from the loan servicers and lenders. The statute says that the Secretary must "ensure access" to such records—it does not require him to order the lenders and loan servicers to produce such records *sua sponte*.

The Secretary has promulgated regulations which instruct schools to contact the guaranty agencies, rather than the lenders or loan servicers, to receive the relevant loan servicing and collection records. *See* 34 C.F.R. § 668.17(h)(3)(iii). The guaranty agencies are to provide the schools with a statistically representative sample of "the records submitted by the lender to support the lender's submission of a default claim and included in the claim file." *Id.*

The Secretary's general policy, as embodied in his regulations, of providing the schools with the records in the possession of the guaranty agencies is a permissible interpretation of the statute. Guaranty agencies are expected to retain all records provided by the lenders in support of their filed claim. *See* 34 C.F.R. § 682.414(a)(1)(ii)(A). Includ-

---

**15.** Although I am confining my review in this case to the administrative record, *see, e.g., Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Horizons Int'l Inc. v. Baldridge*, 811 F.2d 154, 162–63 (3d Cir.1987); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C.Cir.1993); *Abington Mem. Hosp. v. Heckler*, 576 F.Supp. 1081, 1087 n. 3 (E.D.Pa. 1983), *opinion adopted*, 750 F.2d 242, 243 (3d Cir.), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985), I note that I found Tara Porter's testimony at the preliminary injunction hearing regarding the methodology used by the Department in analyzing the PHEAA records to be persuasive. *See* N.T. Dec. 2, 1996 at 70–135. She effectively rebutted the claims put forth by the plaintiffs' expert witnesses regarding the inability to determine whether the requirements of § 668.17 could be determined from the records provided by PHEAA.

ed in that documentation should be sufficient information to show that all due diligence requirements found in 34 C.F.R. § 682.411 [16] were properly performed. *See* 34 C.F.R. § 682.406(a)(3) (requiring lenders to submit documentation sufficient to show that due diligence has been performed). Because the guaranty agencies are required to retain the loan servicing collection records provided by the lender in support of its claim, the Secretary may reasonably assume that the school can obtain all of the information required to file an appeal from the guaranty agency and there is no need to directly contact the lenders or loan servicers. Encouraging the schools to go through the guaranty agencies, which ideally should act as a clearinghouse for the lenders' information, is considerably more efficient as there are many fewer guaranty agencies than lenders, the Secretary has substantially more control over the guaranty agencies, and it may be very burdensome for the Secretary to force each individual lender or loan servicer to disgorge its information.

If McCarrie was dissatisfied with the information it received from the guaranty agencies, nothing prevented it from seeking the information it sought directly from the loan servicers or lenders or from requesting the Secretary's assistance in obtaining this information directly from the loan servicers or lenders. McCarrie did neither. Under these circumstances, I believe McCarrie must assume some of the blame for its failure to receive records which it never requested.

The Secretary has not, therefore, violated the HEA and his actions as embodied in his regulations were not arbitrary, capricious or otherwise in conflict with Congressional intent.

VI. Due Process

■ Finally, McCarrie raises a specious argument that the Secretary has violated the due process clause of the Fifth Amendment by terminating its participation in the FFEL program without an adequate method for appealing the Secretary's decision.

A procedural due process claim requires a two part showing. First, the plaintiff must prove that he has a property or liberty interest protected by the Due Process Clause of the Fifth Amendment. *See Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). If the plaintiff can show such a protected interest, he must further show that "the procedure for challenging the deprivation does not satisfy the requirements of procedural due process." *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 597 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995). In determining what process is due, the court must balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Matthews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

It is unlikely that the plaintiff has a protected property or liberty interest in continued participation in the FFEL program. The intended beneficiaries of federal loan programs are students—students are given federal loans to seek an education at a qualified institution—and the plaintiff, in all likelihood, lacks a protectable interest under the statute. As the Court of Appeals for the Ninth Circuit has recently concluded:

> [B]ecause the [Higher Education] Act did not intend to benefit plaintiffs in the College's situation, any harm from administering the Act can only be termed "indirect." Procedural due process protections do not extend to those who suffer indirect harm from government action. *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 787–88, 100 S.Ct. 2467, 2476–77, 65 L.Ed.2d 506 (1980). Thus, indirect benefi-

---

**16.** If the documentation is sufficient to show that the more stringent requirements of § 682.411 have been satisfied, it must surely be sufficient to

show that the elements in § 668.17 have been satisfied.

ciaries of government programs have no due process rights.

*Dumas v. Kipp,* 90 F.3d 386, 392 (9th Cir. 1996); *see also Independent Enterprises, Inc. v. Pittsburgh Water & Sewer Auth.,* 103 F.3d 1165, 1178 (3d Cir.1997) ("Statutes requiring the award of public contracts to the lowest bidder exist solely for the benefit of taxpayers, and only taxpayers suffer a legally cognizable injury from a violation of the statute that entitles them to bring suit. Thus, the statute bestows no legally enforceable right on a bidder prior to the acceptance of its bid."). *But see Continental Training Serv., Inc. v. Cavazos,* 893 F.2d 877 (7th Cir.1989) (finding that schools have protected property interest in continued participation in federal loan programs).

Even if the court were to accept the dubious proposition that McCarrie has a protected interest in continued participation in the FFEL program, the plaintiff has received sufficient process in this case. The requirements of due process are flexible, and the appropriate amount of process due varies depending on the context of the case. *See Harris v. City of Philadelphia,* 47 F.3d 1333, 1338 (3d Cir.1994) ("The fundamental requirements of due process are notice and a meaningful opportunity to be heard, but the 'concept is flexible, calling for procedural protection as dictated by the particular circumstances.'" (quoting *Kahn v. United States,* 753 F.2d 1208, 1218 (3d Cir.1985))); *Stehney v. Perry,* 101 F.3d 925, 936 (3d Cir. 1996).

In this case, the Secretary provided the plaintiffs with a pre-deprivation remedy to challenge the Department's termination decision. In the context of discontinuation of participation in educational programs, the opportunity to challenge the Secretary's determination through written submissions is cer-tainly sufficient to satisfy due process. *See Dumas,* 90 F.3d at 392; *Continental,* 893 F.2d at 894 (pre-deprivation written submissions procedure is sufficient process before termination from HEA programs); *see also Interboro Institute, Inc. v. Foley,* 985 F.2d 90 (2d Cir.1993) (written submissions sufficient procedure before termination of school from financial aid program).[17]

Further, McCarrie was also provided with a more than adequate post-deprivation remedy to challenge the validity of the Secretary's actions under the Administrative Procedure Act. *See Dumas,* 90 F.3d at 392; *Calise Beauty Sch., Inc. v. Riley,* 941 F.Supp. 425, 430 (S.D.N.Y.1996) (administrative appeals combined with possibility of declaratory relief under the APA meets due process); *see also Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.) (where state judicial review of state administrative action is provided, due process is generally satisfied), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988); *Doolin Security Savings Bank v. F.D.I.C.,* 53 F.3d 1395, 1404 (4th Cir.) (opportunity for review of agency decision under the APA supports conclusion that due process is afforded), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 402 (1995).

The court therefore concludes that the plaintiff's due process complaint is wholly without merit.

\* \* \*

In the end, McCarrie's "complaint boils down to nothing more than a simple dissatisfaction with the conclusion reached by the [Secretary]." *Pennsylvania v. Riley,* 84 F.3d 125, 131 (3d Cir.), *cert. dismissed,* —— U.S. ——, 117 S.Ct. 282, 136 L.Ed.2d 200 (1996). Despite the extensive litigation which has taken place to date, and the perhaps unwarranted extra-record evidence

---

**17.** Indeed, to the extent that plaintiff attempts to challenge the adequacy of the pre-deprivation process provided by the Department in its regulations, the Administrative Procedures Act is the proper method to make that challenge—not a claim under the due process clause. Given that courts should avoid constitutional questions where an alternative ground for resolving a claim is available, *see United States v. Locke,* 471 U.S. 84, 92, 105 S.Ct. 1785, 1791, 85 L.Ed.2d 64 (1985) ("[T]his Court will not pass on the consti-tutionality of an Act of Congress if a construction of the Act is fairly possible, or some other non-constitutional ground fairly available, by which the constitutional question can be avoided."), and the fact that the court has already determined that the procedure provided by the Department was adequate, the court will not address the adequacy of the process provided by the Department in the context of a constitutional challenge.

which the court has permitted McCarrie to investigate, McCarrie has never directed the court to any real evidence that its cohort default rates for 1991–1993 were actually below 25%. *See id.* Given that the Secretary has in all instances acted reasonably within the dictates of the Higher Education Act, and Congress's unquestioned resolve to discontinue schools with excessive default rates from participation in the FFEL program, McCarrie's complaints are better directed to that institution than this court. Judgment will be entered in favor of the Secretary and against McCarrie.

## ORDER

AND NOW, this 24th day of June, 1997, after consideration of the parties' briefs on the merits and careful review of the administrative record, IT IS HEREBY ORDERED that:

1. Plaintiffs American Institute of Design and Craft Educational Institute are DISMISSED without prejudice pursuant to the voluntary withdrawal of their claims.

2. Plaintiff McCarrie's motion for summary judgment is DENIED, defendant's motion for summary judgment is GRANTED, the decision of the Secretary of Education is AFFIRMED and JUDGEMENT IS ENTERED in favor of defendant and against plaintiff McCarrie.